UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

---

```
                                  )
VALERIA CRUZ MARCHAN,             )
RICARDO EMANUEL PEREZ             )
                                  )
              Plaintiffs,         )
                                  )
         v.                       )        CIVIL ACTION
                                  )        NO. 3:16-00357-WGY
JOHN MILLER FARMS, INC.,          )
CRARY INDUSTRIES, INC.,           )
d/b/a NORTH VALLEY EQUIPMENT,     )
HARRISTON-MAYO LLC,               )
d/b/a MAYO MANUFACTURING COMPANY, )
TERRAMARC INDUSTRIES, INC., AND   )
KRG CAPITAL PARTNERS, LLC.        )
                                  )
              Defendants.         )
                                  )
```

---

YOUNG, D.J.[1]                                    December 11, 2018

### MEMORANDUM OF DECISION

This is a serious and complex products liability action now
nearing trial. The Plaintiffs (collectively "Marchan") have
sued a variety of defendants. A rough schematic of the relevant
corporate relationships between and among the manufacturer (on
the right) and the retailer (on the left) follows:

---



Having heard a number of different motions for summary judgment, the Court denied them all on October 4, 2018 due to the existence of genuine issues of fact for the jury. This explanation of the Court's action suffices here notwithstanding the exhortation in Federal Rule of Civil Procedure 56(a) to provide a more detailed explication for even a denial of a

motion for summary judgment.  See United States v.

Massachusetts, 781 F. Supp. 2d 1, 19-20 (D. Mass. 2011); Federal

Trade Comm'n v. D-Link Sys., Inc., No. 17-cv-00039-JD, 2018 U.S.

Dist. LEXIS 199023, at *1-3 (N.D. Cal. Nov. 5, 2018).

Two issues, however, warrant more extended analysis and the

Court takes them up in turn.

**A. Indemnity Claim of the Seller**

Crary asserted in its crossclaim that, contractually and

under the common law, TerraMarc and KRG were required to

indemnify it.  Crary Answer Crossclaims 8-9, ¶¶ 25-36, ECF No.

72.  KRG and TerraMarc moved for summary judgment on Crary's

crossclaims.  KRG Mot. Summ. J. Crossclaims 1, ECF No. 94;

TerraMarc Mot. Summ. J. Crossclaims 1, ECF No. 96.  Crary

settled with the Plaintiffs prior to the June 1, 2018 motion

session.  During the motion session, Crary asserted that despite

its recent settlement with the Plaintiffs, it was remaining a

party in the case because it was entitled to statutory

indemnification from the manufacturer, Harriston-Mayo or KRG.

Crary argued that a seller is entitled to indemnity even if the

manufacturer is found not liable.

According to section 28-01.3-05 of the North Dakota Century

Code, a seller has a right to indemnity against a manufacturer:

> If a product liability action is commenced against a
> seller, and it is alleged that a product was

> defectively designed, contained defectively
> manufactured parts, had insufficient safety guards, or
> had inaccurate or insufficient warning; that such
> condition existed when the product left the control of
> the manufacturer; that the seller has not
> substantially altered the product; and that the
> defective condition or lack of safety guards or
> adequate warnings caused the injury or damage
> complained of; <u>the manufacturer from whom the product
> was acquired by the seller must be required to assume
> the cost of defense of the action, and any liability</u>
> that may be imposed on the seller. <u>The obligation to
> assume the seller's cost of defense should also extend
> to an action in which the manufacturer and seller are
> ultimately found not liable.</u>

N.D. Cent. Code § 28-01.3-05 (emphasis supplied). Crary argues

that it maintains its indemnity right even if the manufacturer

is found not liable. Crary Mem. Opp'n KRG and Terramarc Mot.

Summ. J. 5-8 ("Crary's Opp'n"), ECF No. 113. It bases its

argument on the provision's last sentence which says: "[t]he

obligation to assume the seller's cost of defense should also

extend to an action in which the manufacturer and seller are

ultimately found not liable." N.D. Cent. Code § 28-01.3-05;

Crary's Opp'n 7.

The North Dakota Supreme Court previously had taken a

different approach to this issue. See <u>Kaylor</u> v. <u>Iseman Mobile

Homes</u>, 369 N.W.2d 101, 104 (N.D. 1985); <u>Winkler</u> v. <u>Gilmore &

Tatge Mfg. Co.</u>, 334 N.W.2d 837, 841 (N.D. 1983). In <u>Winkler</u>,

the North Dakota Supreme Court interpreted section 28-01.1-07,

the former indemnity provision, which was the same as the

present statute but did not include the last sentence.

[4]

334 N.W.2d at 838-42. There, the court determined that "the intent of § 28-01.1-07, NDCC [was] to allow indemnity in those cases where only the manufacturer is found liable and the seller is absolved." Id. at 841. In Kaylor, the North Dakota Supreme Court reaffirmed its holding in Winkler, emphasizing that it would be "absurd" for the North Dakota Century Code to allow indemnity in cases where the manufacturer was found not liable. 369 N.W.2d at 104 (quoting Winkler, 334 N.W.2d at 841).

Today's section 28-01.3-05 provides for a result different than that in Winkler and Kaylor. When "the provisions of a statute differ from previous case law, the statute prevails." Bornsen v. Pragotrade, LLC, 804 N.W.2d 55, 61 (N.D. 2011) (quoting Vandall v. Trinity Hosps., 676 N.W.2d 88, 93 (N.D. 2004)). Thus, section 28-01.3-05 abrogated section 28-01.1-07 and the case law interpreting it.

Since there appear to be no cases analyzing section 28-01.3-05, the proper interpretation of the statute is a matter of first impression for the Court.[2] The legislature made clear that

_____

[2] The Texas Products Liability Act has a similar statutory indemnification clause, requiring manufacturers to indemnify sellers regardless of how the action is resolved, unless the seller was negligent and directly caused the injury to the plaintiff. See Tex. Civ. Prac. & Rem. Code §§ 82.002(e)(1), 82.002(a) ("A manufacturer shall indemnify and hold harmless a seller against loss arising out of a products liability action, except for any loss caused by the seller's negligence, intentional misconduct, or other act or omission, such as

[5]

there was an "urgent need for additional legislation to establish clear and predictable rules with respect to certain matters relating to products liability actions." N.D. Cent. Code § 28-01.3-07.

The question, then, is whether Crary has any right to indemnity after settling with Marchan, regardless of whether the manufacturer is found liable. The general rule is that "an indemnitee who settles a claim before judgment must prove that it was not a volunteer, but was actually liable, in order to recover indemnity." Grinnell Mut. Reinsurance Co. v. Center Mut. Ins. Co., 658 N.W.2d 363, 378 (N.D. 2003); see also 42 C.J.S. Indemnity § 46 (1991); 41 Am. Jur. 2d Indemnity § 46 (1995). A good faith settlement, however, "is entitled to indemnity, or subrogation, even though it develops that he in fact had no interest to protect." Grinnell, 658 N.W.2d at 378 (quoting Aetna Life & Cas. Co. v. Ford Motor Co., Cal. Rptr. 852, 854 (Ct. App. 1975)). There is no indemnity "to one who has paid voluntarily." 42 C.J.S. Indemnity § 46. Thus, Crary must show at trial that its payment was not that of a volunteer. Id.

In addition, KRG and Terramarc argue that Crary is a manufacturer under North Dakota law. KRG Reply 4-6, ECF

negligently modifying or altering the product, for which the seller is independently liable.")

No. 120; TerraMarc Reply 3-4, ECF No. 121. The parties do not dispute that Harriston Mayo manufactured and North Valley Equipment sold the conveyor while both were subsidiaries of TerraMarc. Id. North Dakota Century Code section 28-01.3-01 provides that a "seller of a product who is owned in whole or significant part by the manufacturer, or owns, in whole or significant part, the manufacturer" is treated as a manufacturer. To be shielded from liability, Crary must show that it should be treated solely as a seller. N.D. Cent. Code § 28-01.3-04(1). Therefore, Crary's right to indemnity here is not a foregone conclusion and the issue ought be decided at trial.

## B. Piercing the Corporate Veil: Who Decides – Jury or Judge?

Because the manufacturer appears to be defunct, as a practical matter Marchan will need to pierce the corporate veil and reach its owner, KRG Capital Partners LLC, in order to obtain any substantial recovery.

Who will decide this important question? The Supreme Court of North Dakota commits the issue to the judge under North Dakota law. Watts v. Magic 2 x 52 Mgmt., Inc., 816 N.W.2d 770, 772-75 (N.D. 2012). Neither the United States Supreme Court nor the Eighth Circuit has addressed this issue. The first federal circuit court to address it was the Fifth Circuit. As far back as 1980, it had held that the issue of veil piercing was for the

jury.  FMC Fin. Corp. v. Murphee, 632 F.2d 413, 421 n.5 (5th Circ. 1980) (observing that "whether a judge or jury decides an issue is one of federal law, with no Erie analysis problems."). In 1991, after an exhaustive historical analysis, the Second Circuit likewise held that the jury must decide, Wm. Passalacqua Builders v. Resnick Developers, 933 F.2d 131, 135-37 (2d Cir. 1991), and the First Circuit, citing Passalacqua -- as have all federal cases on point after its issuance -- followed suit in Crane v. Green & Freedman Baking Co., 134 F.3d 17, 22 (1st Circ. 1998).³  Only the Seventh Circuit goes the other way. International Fin. Servs. Corp. v. Chromas Techs. Can., Inc., 356 F.3d 731, 738 (7th Cir. 2004).  Who's right?

This Court holds that the jury must decide the veil-piercing issue.

While the jurisprudence of North Dakota is well developed, see Watts v. Magic 2 x 52 Mgmt., 816 N.W.2d at 772; Coughlin Construction Co. v. Nu-Tec Indus., Inc., 755 N.W.2d 867, 870 (N.D. 2008); Intercept Corp. v. Calima Financial, LLC, 741 N.W.2d 209, 213 (N.D. 2007); Axtmann v. Chillemi, 740 N.W.2d 838, 843 (N.D. 2007); Jablonsky v. Klemm, 377 N.W.2d 560, 565

---

³ The decision of the Sixth Circuit in CNH Capital Am. LLC v. Hunt Tractor Inc., 368 F. Appx. 461, 467 (6th Cir. 2014) is not to the contrary as it arises in a bankruptcy context where Seventh Amendment values are not implicated and resort to the applicable state law is appropriate.

(N.D. 1985); Hilzendager v. Skwarok, 335 N.W.2d 768, 772 (N.D. 1983), these cases, ultimately dependent on the Constitution of North Dakota, are of no moment here as this federal case depends on the Seventh Amendment to the United States Constitution. See Byrd v. Blue Ridge Rural Elec. Co-op., Inc., 356 U.S. 525, 531 (1958); Full Spectrum Software, Inc. v. Forte Antomation Sys., 858 F.3d 666, 677-78 (1st Cir. 2017) (Barron, J.) (holding that the Seventh Amendment requires a jury trial in federal court for cases under the Massachusetts consumer protection statute, even if no jury is required in state courts for the same).

The **Jury** Trial Clause of the Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by **jury** shall be preserved." U.S. Const. amend. VII (emphasis supplied). The phrase "suits at common law" refers not only to causes of action that existed in 1791, when the Seventh Amendment was adopted, but also to new causes of action created by statute, as long as those statutes "create[] legal rights and remedies, enforceable in an action for damages in the ordinary courts of law." Curtis v. Loether, 415 U.S. 189, 194 (1974). To determine whether a statute "creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law," I undertake a three-part inquiry. Id.

While neither the United States Supreme Court nor the Eighth Circuit has decided the precise issue before this Court, the Supreme Court spelled out the proper analytic approach in Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 42 (1989). First, I must "compare the new statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity." Granfinanciera, 492 U.S. at 33 (quoting Tull v. United States, 481 U.S. 412, 417-18 (1987)). I do so to determine whether the current action is "analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century." Id.

Second, I must "examine the remedy sought and determine whether it is legal or equitable in nature." Id. This stage of the analysis is more important than the first. Id.

Finally, if the first two inquiries indicate that a party has a *jury* trial right, I need to undertake one more step. I must determine if Congress has "assigned resolution of the relevant claim to a non-Article III adjudicative body that does not use a *jury* as factfinder," such as the Bankruptcy Court. Id. (emphasis supplied). For, if Congress has done so, then I must assess whether the legal claim at issue is a private or a public right in order to determine whether the legislative assignment is permissible. Id. at 51-52.

Here, the third step is not implicated and only the first

two steps are material.  This Court adopts the well-reasoned

approach of the Second Circuit and concludes at the first stage,

as did that Court, that historical "sources support the

proposition that the nature of the ancient action disregarding

the corporate form had equitable and legal components."

Passalacqua, 933 F.2d at 136.

Likewise, at the second stage, this Court can do no better

than paraphrase Passalacqua:

> Having examined the way this issue was treated
> historically, [I] turn next to examine the remedy
> sought.
>
>  Plaintiffs here seek . . . a money judgment . .
> . .  The fact that plaintiffs seek money indicates a
> legal action.  See Pernell, 416 U.S. at 370 ("'where
> an action is simply for the recovery . . . of a money
> judgment, the action is one at law'") (quoting
> Whitehead v. Shattuck, 138 U.S. 146, 151 (1891));
> Dairy Queen, Inc. v. Wood, 369 U.S. 469, 476 (1962)
> ("[I]nsofar as the complaint requests a money judgment
> it presents a claim which is unquestionably legal").
>
>  . . . As just discussed, the action for piercing
> the corporate veil does not sound solely in equity.
> Further, while it is true that "the right to a jury
> trial depends on the nature of the relief sought, not
> on what may ultimately be secured," Damsky v. Zavatt,
> 289 F.2d 46, 56 (2d Cir. 1961), the nature of the
> relief sought in the instant case is relief typically
> achieved in an action at law.  Plaintiffs seek to
> establish defendants' liability [for an adverse jury
> finding against the now-defunct manufacturer].  This
> is analogous to the second phase of the old creditors'
> bill procedure in which the creditors, having obtained
> a judgment against the corporation in equity, then
> enforced that judgment against the individual
> stockholders at law.

Because the action for piercing the corporate
veil appears to have its roots in both law and equity,
and the nature of the relief sought here supports the
conclusion that plaintiff's cause of action is legal
in nature, it [is] entirely proper for the district
court to submit the corporate disregard issue to the
jury.  See Beacon Theatres, Inc. v. Westover, 359 U.S.
500, 510-11 (1959) ("'[jury] right cannot . . . be
impaired by any blending with a claim, properly
cognizable at law, of a demand for equitable relief in
aid of the legal action or during its pendency'")
(quoting Scott v. Neely, 140 U.S. 106, 109-10 (1891));
cf. Ross v. Bernhard, 396 U.S. 531, 538-43 (1970)
(finding a right to jury trial in a shareholder's
derivative suit, a type of suit traditionally brought
in courts of equity, because plaintiffs' case
presented legal issues of breach of contract and
negligence).

Moreover, as a practical matter separate from
Seventh Amendment considerations, whether or not [the
appropriate] factors . . . that will justify ignoring
the corporate form and imposing liability on
affiliated corporations or shareholders are present in
a given case is the sort of determination usually made
by a jury because it is so fact specific.  See
Blumberg, The Law of Corporate Groups § 7.02.2, at
144.

Passalacqua, 136-37.

The Seventh Circuit is the outlier circuit on this issue

and its decision in International Fin. Servs. Corp., 356 F.3d at

738, is flawed by its erroneous belief that in a diversity case,

a citizen's Seventh Amendment jury trial rights may somehow be

circumscribed by substantive state law.  This is simply wrong.

Federal Rule of Civil Procedure 39(a) provides unequivocally:

The trial on all issues so demanded **must be by jury**
unless:

> (2) the court, on motion or on its own, finds
> that on some or all of those issues there is no
> **federal** right to a jury trial.

(emphasis supplied); see also Full Spectrum Software, Inc., 858

F.3d at 674.  Ironically, although the Seventh Circuit noted in

International Fin. Serv. Corp. that the Fifth Circuit's holding

in FMC Fin Corp. "is not supported by analysis or appropriate

authority" and declined to follow it, 356 F.3d at 739, the Fifth

Circuit in fact got it right and cited the controlling Federal

Rule, 632 F.2d at 421 n.5.

The analysis ought not end here.  Some scholars have

recently advocated making judges, not juries, decide whether to

pierce the corporate veil:

> [J]udges . . . are best suited to decide in each case
> whether the corporate veil should be pierced, for four
> reasons: (1) veil piercing is an inherently equitable
> remedy that judges are better equipped to decide; (2)
> veil-piercing inquiries require a weighing of legal
> fictions and concepts that lay jurors simply are not
> trained to perform; (3) decisions by judges are likely
> to produce more consistent results in similar cases;
> and finally (4) judges can likely make veil-piercing
> decisions more efficiently than juries can.

Brian D. Koosed, Anthony P. Badaracco, and Erica R. Iverson,

Disregarding the Corporate Form: Why Judges, Not Juries, Should

Decide the Quiddits and Quillets of Veil Piercing, 13 N.Y.U.

J.L. & Bus. 95, 136 (2016); see also Mark A. Olthoff, Beyond the

Form--Should the Corporate Veil Be Pierced?, 64 UMKC L. Rev.

311, 336 (1995) ("Because consideration of these factors

involves a weighing test, a jury may be ill-suited to decide the question.  Therefore, the trial judge should make the final determination of the piercing issue.").

These contentions crop up from time to time in different contexts.  See, e.g., Brandon M. Reed, Who Determines What Is Egregious? Judge or Jury?, 34 Ga. St. U.L. Rev. 389, 426 (2018) (arguing that judicial determinations of willful or egregious patent infringement "will reduce prejudice at trial, increase judicial efficiency, and foster predictable outcomes in litigation."); but see David Nimmer, Juries and the Development of Fair Use Standards, 31 Harv. J. L. & Tech. 563, 589-93 (2018) ("Learning to Love the Seventh Amendment").  It is appropriate to point out that most of these unsupported conclusions are nothing but elitism, pure and simple.  They are an unabashed retreat from the magnificent vision of the Founders.  "The Seventh Amendment promised to 'preserve[]' the right of 'trial by jury' in virtually all civil suits 'at common law' and limit the power of federal judges to overturn any fact properly found by a civil jury."  Akhil Reed Amar, America's Unwritten Constitution 435 (Basic Books 2012).

Let's deal with the quoted contentions in reverse order:

**Efficiency.**  Yes, there **is** something to this argument in the present case.  The issue of veil piercing has been fully briefed and argued.  There is nothing to suggest that further

discovery will add to the store of information available to decide this issue. Unfortunately, the existence of a judicial vacancy makes it unlikely that this case will come before a local jury in North Dakota before well into 2019 and this is far too slow. This does not reflect on **jurors**, however. Rather, it is a result of the lack of **judicial** resources to preside over the requisite jury trial. More particularly, it reflects that I am unable, in view of my own caseload and the cases in other districts I visit, to go to Fargo, North Dakota to try this case. Efficiency **is** one component of justice, but it is not the sole goal of the justice system. Were that not the case, why have trials at all?

**Consistency.** Hardly. The great strength of our common law system is reasoned inconsistency, i.e., each court reaching out for the best possible justice in the case before it, where reasoned but varying decisions draw from the body of other such decisions with the idea that the law will grow and adapt based on such reasoning. Ours is not a civil code system where I can simply look up the rule and apply it to each case.

> The working judge is not and never has been a philosopher. He has no coherent system, no problem solver for all seasons, to which he can straightaway refer the normative issues. Indeed, if he could envision such a system for himself, he would doubt that, as a judge, he was entitled to resort to it; he would think he must be less self-regarding.

Hon. Benjamin Kaplan, Justice, Massachusetts Supreme Judicial
Court, Encounters with O.W. Holmes, Jr., 96 Harv. L. Rev. 1828,
1849 (1983).

**Judges are better equipped -- jurors are not trained to
weigh legal concepts.**

This is simply not true.  I have been a trial judge for
over forty years.  In the fact-finding line, anything a judge
can do a jury can do better.  The best sociological evidence
confirms this truth.  See James Surowiecki, The Wisdom of Crowds
(2004).

The fact-finding most analogous to that involved in the
veil-piercing inquiry is the fact-finding undergirding a
determination of successor liability -- surely a jury issue.
See, e.g., Jury Verdict, Thomas & Betts Corp. v. New
Albertson's, Inc., No. 10-11947-WGY (D. Mass. Dec. 12, 2015),
ECF No. 801.  Likewise, in the case at bar, the jury will need
to decide whether the product was of merchantable quality,
whether it was unreasonably dangerous, and perhaps the
comparative negligence of the parties on certain counts.  It may
also have to assess both compensatory and punitive damages.

Four months ago, I watched a jury learn about the mechanics
of 3-D printing and analyze a certain interface layer at the
microscopic level to determine obviousness and infringement.
Tr. Jury Trial, Desktop Metal, Inc. v. Markforged, Inc., No.

1:18-cv-10524-WGY (D. Mass. Sept. 24-27, 2018), ECF Nos. 559-64.
More recently, I watched a jury determine probable cause to
remove an obstreperous passenger from a campus shuttle bus.
Electronic Clerk's Notes, Strahan v. Parlon, No. 1:17-11678-WGY
(D. Mass. Sept. 17-20, 2018), ECF Nos. 156-61. I asked another
jury this question: "Did the anticompetitive effect of [a]
settlement [between two pharmaceutical companies] outweigh any
procompetitive justifications?" Jury Charge at 37:9-18, In re
Nexium (Esomeprazole) Antitrust Litig., No. 12-md-02409-WGY
(D. Mass. Dec. 3, 2014), ECF No. 1441, aff'd, 842 F.3d 34 (1st
Cir. 2016).

Jurors have long been deciding all these issues and many
more complex. It takes a special type of arrogance simply to
conclude that American jurors cannot handle the veil-piercing
issues presented here.

Quite simply, jurors are the life's blood of our third
branch of government.

It is not too much to say that a courthouse without jurors
is a building without a purpose. See Judith Resnik & Dennis E.
Curtis, Representing Justice: Invention, Controversy, and Rights
in City-states and Democratic Courtrooms 293 (Yale University
Press 2011); Lewis F. Powell, Jr., Foreword to John O. and
Margaret T. Peters, Virginia's Historic Courthouses xi
(University Press of Virginia 1995) ("Public buildings

often . . . reflect the beliefs, priorities, and aspirations of a people. . . . For much of our history, the courthouse has served not just as a local center of the law and government but as meeting ground, cultural hub, and social gathering place."). It is a quiet government museum to what was once the most extensive and robust expression of direct democracy the world has ever seen.

Come in.  Look around.  It's quiet.  The real work goes on in judicial chambers, hidden from public view.  See Brock Hornby, The Business of the U.S. District Courts, 10 Green Bag 2d 453 (2007).  You can hear your footsteps along the broad corridor past the vacant courtrooms.  Go into a courtroom. There will be an American flag, limp upon its staff.  Along one wall is the jury box.  There decent, common-sense Americans with an overarching sense of duty have sat for years.  Again and again, the courtroom has heard the clerk intone the familiar cry, "Ladies and gentlemen, please stand and harken to your verdict as the Court records it."  No more.

In this courtroom, the chairs in the jury box are empty, mute testimony to the consistent derision of self-interested corporations,[4] shallow stereotyping by lawyers and scholars who

---

[4] While corporations primarily use forced arbitration to bar access to our justice system altogether, see Cynthia Estlund, The Black Hole of Mandatory Arbitration, 96 N.C. L. Rev. 679, 709 (2018); see also Jessica Silver-Greenberg & Michael Corkery,

do not know their way around a courtroom, and the virtual abandonment of the civil jury by those judicial officers most charged with keeping our jury system vital and flourishing.

Americans themselves may yet rescue their right to a jury. Workers at Uber, Lyft, Microsoft, Google, and Facebook have caused those corporations to abjure forced arbitration of claims of sexual harassment and assault. See Daisuke Wakabayashi & Jessica Silver-Greenberg, Facebook to Drop Forced Arbitration in Sexual Harassment Cases, N.Y. Times, November 9, 2018, at B1; Kate Conger & Daisuke Wakabayashi, Google Bows to Demands to Overhaul Abuse Policy, N.Y. Times, November 9, 2018, at B1; Daisuke Wakabayashi, Yielding to Critics, Uber Eliminates Forced Arbitration in Sexual Misconduct Cases, N.Y. Times, May 16, 2018, at B3.[5] Large law firms are increasingly yielding to

---

In Arbitration, a 'Privatization of the Justice System,' N.Y. Times, Nov. 1, 2015, data support their self-interested decision even in those few cases that are actually heard. As one would expect, in state courts, corporations win somewhat less than half the time. Alexander J. S. Colvin, An Empirical Study of Employment Arbitration: Case Outcomes and Processes, 8 J. Empirical Legal Stud. 1, 5 (Table 1) (2011). In the more rules-bound federal courts, they win 63% of the time. Id. In arbitration, where the corporation is a repeat player, i.e., is active in the market hiring arbitrators, it wins a whopping 83% of the time. Id. at 13 (Table 3).

[5] Remarkably, despite these workers' disparate and unfocused protests, they are the direct descendants of the views of our Revolutionary-era patriots. As Professor Jamal Green points out so persuasively:

> [T]he mode of representation that would best resist the Executive was less the legislature than the

pressure to drop mandatory arbitration agreements for

employment-related claims, such as those alleging sexual

harassment and discrimination. See Chris Villani, After

Kirkland, Sidney Arbitration Flip, Group Eyes DLA Piper, Law360,

Nov. 28, 2018 (describing how pressure from Harvard Law School

students led Kirkland & Ellis and Sidley Austin LLP to end

---

> jury, which the Founding generation saw as an
> essential vehicle for articulating the rights of the
> community. "In these two powers consist wholly, the
> liberty and security of the people," John Adams wrote
> of voting for the legislature and of trial by jury.
> "They have no other fortification against wanton,
> cruel power: no other indemnification against being
> ridden like horses, fleeced like sheep, worked like
> cattle, and fed and cloathed like swine and hounds: No
> other defence against fines, imprisonments, whipping
> posts, gibbets, bastenadoes and racks."
>     Adams was writing in 1766, against the Stamp Act,
> but the view of juries as bound up crucially with
> rights recognition and enforcement motivated the Bill
> of Rights. In criticizing the 1787 Constitution, the
> influential antifederalist Federal Farmer called the
> jury trial and legislative representation "the wisest
> and most fit means of protecting [the people] in the
> community." Jurors were drawn from that very community
> and had vast powers of investigation, via the grand
> jury, and adjudication, via the petit jury. As
> Professor Akhil Reed Amar emphasizes, jury service was
> commonly viewed as analogous to service in the
> legislature itself.
>     2. Rights as Federalism. -- Viewing the Bill of
> Rights through an eighteenth-century lens illuminates
> its focus on institutional form. A remarkable number
> of its amendments seek to preserve the role of the
> jury and other local representative institutions in
> federal administration.

Jamal Greene, Rights as Trumps?, 132 Harv. L. Rev. 28, 112-13
(2018) (footnotes omitted).

forced arbitration for employees, while DLA Piper, Drinker Biddle & Reath LLP, Knobbe Martens, Paul Hastings LLP, Stoel Rives LLP, and Varnum LLP retain such clauses in their employment contracts). <u>But see</u> Michael Selby-Green, <u>Morgan Stanley is fighting to stop a race-discrimination suit from going to trial by using a controversial tactic that keeps employee complaints secret</u>, Bus. Insider, October 6, 2018; Anthony J. Oncidi, <u>Consider the True Implications of Waiving Arbitration</u>, Daily Journal, Nov. 14, 2018 (implicitly characterizing forced arbitration as a weapon and suggesting that dropping it is "a dangerous form of unilateral disarmament").

Do you care about any of this?

You should.

Your rights depend on it.


<u>/s/ William G. Young</u>
WILLIAM G. YOUNG
DISTRICT JUDGE